UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

PRINCE BEY,

       Plaintiff,

v.                          Case No. 03-3210

DOUGLAS A. CRAVENS,
SGT ALBERT,
ANTHONY A. RAMOS,
MAVIS GROSS, and
JONATHAN WALLS,

       Defendants.

### Order

Before the Court are cross-motions for summary judgment (d/e's 38, 41). For the reasons below, the Court denies both motions and sets the case for trial.

### Standard

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56©. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Outlaw, 259 F.3d at 837. In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

### Background

After conducting a merit review and ruling on the defendants' motion to dismiss, the court identified the following remaining claims:

      a) Defendants Gross and Walls bear personal responsibility for the alleged retaliation against the plaintiff for exercising his First Amendment rights.[1]

      b) The plaintiff's housing and cell conditions in gallery four at Menard from December, 2001 to June, 2002, violated the Eighth Amendment and/or were done in retaliation for the plaintiff's exercise of his First Amendment.

(d/e 8/23/04). All the defendants, except for Mavis Gross and Jonathon Walls were dismissed in the court's order

---

[1]This claim did not include the alleged retaliation arising from a false disciplinary report and subsequent disciplinary hearing and punishment, which the court barred by *Heck v. Humphrey*, 512 U.S. 477, 484-487 (1994) and progeny.

of August 23, 2004.

### Facts and Inferences

Defendants' motion for summary judgment is based almost exclusively on the plaintiff's deposition. The plaintiff has not specifically identified the proposed facts he disputes, but it is clear enough from his submissions for his own summary judgment. The facts and inferences in this section are drawn from both parties' submissions with their summary judgment motions (d/e's 38, 39, 41, 42, 43, 44). Where factual disputes exist, reasonable inferences are made in favor of the plaintiff. These facts and inferences are set forth for purposes of this order only–the evidence at trial may show otherwise.[2]

    1. All the events occurred during the plaintiff's incarceration at Menard Correctional Center in 2001-2002 ("Menard"). Defendant Mavis Gross was employed as a grievance officer at Menard at all times relevant. Defendant Walls was employed as the Warden of Menard at all times relevant.

    2. The plaintiff is classified as a "predator," and he is listed as an enemy by "a whole lot of" other inmates. (Plaintiff's Dep. p. 54).

    3. On October 23, 2001, inmates at Menard took part in a food strike, throwing milk and juice over the gallery. The plaintiff did not participate in the melee. Instead, the plaintiff sent Supt. Hasemeyer a "kite" identifying the inmates who had taken part in the strike.

    4. Despite his assistance in the strike investigation, the plaintiff was transferred to segregation because of his suspected participation in the strike. On October 23, 2001, an allegedly false disciplinary report issued against the plaintiff, accusing him of throwing milk and juice on the gallery during the strike and shouting, "Burn it down." The plaintiff was found guilty and lost one year across the board. The court has already dismissed the plaintiff's challenges to that discipline, because they are barred by *Heck v. Humphrey*, 512 U.S. 477, 484-487 (1994).

    5. On or about November 3, 2001, the plaintiff filed a grievance challenging the disciplinary hearing and the false ticket. Defendant Gross denied his grievance on or about January 28, 2002, and Defendant Walls concurred. (Complaint, d/e 9, Ex. D). As discussed above, the challenge to the disciplinary hearing itself is barred by *Heck*, but the denial of the plaintiff's grievance about it is relevant for his retaliation claim regarding events arising after he was found guilty.

    6. On or about December 27-28, 2001, the plaintiff was moved from segregation on gallery three to segregation on gallery four, "north 2" (also referred to as "N2"), cell 420. The plaintiff says this move occurred after he complained to Defendant Walls about his segregation on the false charges. (Plaintiff's Dep. 40-41).

    7. A reasonable inference arises that some of the plaintiff's declared enemies were housed on gallery 4 when the plaintiff was moved there, specifically:

        a) Inmate Williams (K51449). A reasonable inference arises that Williams was on gallery 4 when the plaintiff was transferred to gallery 4, and remained on gallery 4 for the duration of the plaintiff's stay there. The plaintiff had declared Williams an "enemy" in a grievance dated November 16, 2001 (d/e 43, Ex. G, p. 3): "I want to claim inmate Williams K51449 N2-144 as my enemy! He has continuly [sic] threaten my life, . . . ." Williams was one of the inmates the plaintiff fingered in the kite to Supt. Hasemeyer. (Complaint, d/e 9, Ex. E).

---

[2]Defendants move to strike the plaintiff's motion for summary judgment as untimely. The plaintiff did file his motion about ten days late, but the court believes striking the motion is unwarranted. Additionally, the plaintiff's motion might be more accurately described a response to the defendants' summary judgment motion.

b) Inmate McDaniel (B61940). A reasonable inference arises that Inmate McDaniel was on gallery 4 for the plaintiff's entire stay there. (d/e 43, Ex. H, p.7). The plaintiff declared McDaniel an enemy in a grievance dated January 30, 2002 (d/e 43, Ex. G, p. 6): "I want to declare inmates Davis . . . as my enemy and inmate McDanials [sic] 422 NII seg as my enemy and I received your last response to the grievance in which you said "I don't have to go to yard," Well, why would Sgt [illegible] put me on a gallery with all my enemies and know that I may get assualted [sic] on yard, . . ."

c) Inmate Davis (N51640). According to the plaintiff's January 16, 2002, grievance, inmate Davis (a declared enemy) was on gallery 4 at the same time as the plaintiff, and threatened the plaintiff. (d/e 43, Ex. I, p.4).

8. The plaintiff believes that unidentified staff labeled him as a stool pigeon to other inmates, and spread the word that the plaintiff had sent the kite to Supt. Hasemeyer about the food strike.

9. The gallery four cell to which the plaintiff was moved (cell 420) in December, 2001, had urine and feces on the wall. The plaintiff was given no cleaning supplies, despite his requests. (Plaintiff's Dep. 43-44). The plaintiff had to use his own clothes and water from the sink to clean up the mess. *Id.* The plaintiff did file a grievance about the filthy cell, but he had already cleaned it up by the time he filed that grievance. (Plaintiff's Dep. 44). Cell 420 had a solid door with a mesh screen. *Id.*

10. A reasonable inference arises that inmate McDaniel was housed in cell 422 when the plaintiff was transferred to cell 420. (d/e 43, Ex. H. p. 7).

11. On January 8, 2002, the plaintiff's mother died. Initially, the plaintiff was refused a phone call to his family. (Plaintiff's Dep. 63-64). The plaintiff filed a grievance, but he was given a phone call before Defendant Gross or Walls received the grievance. *Id.*

12. On or about January 16, 2002, the plaintiff was moved from cell 420 to cell 440. (d/e 43, Ex. H. p. 4).

13. A reasonable inference arises that inmate McDaniel was moved from cell 422 to cell 441 on March 13, 2002, the cell next to the plaintiff's. (d/e 43, Ex. H. p. 7).

14. Inmate McDaniel repeatedly threw things in the plaintiff's cell 440, including feces, and "anything he could mix up in a cup." (Plaintiff's Dep. p. 61). The plaintiff testified that he had to sleep under the bed to protect himself from these onslaughts and that one officer gave him some plastic because the officer felt sorry for him. (Plaintiff's Dep. p. 61). The plaintiff was transferred from cell 440 to cell 428 on or around April 24, 2002. (d/e 43, Ex. H. p. 4).

15. Inmates in segregation are generally in their cells 24 hours a day. (Plaintiff's Dep. p. 11).

16. The plaintiff was generally not allowed to leave his cell during segregation, except for yard once a week, for five hours, and for showers.

17. A reasonable inference arises that there was no guarantee that the plaintiff's declared enemies on gallery 4 would not be in the same yard as the plaintiff when it was the plaintiff's turn for yard. (Plaintiff's Dep. 12-14; d/e 43, p. 3). Defendants do not assert any effort was made to arrange for different yard times for the plaintiff and his declared enemies.[3]

---

[3]The plaintiff also testified in his deposition that inmates are divided up into four groups of 20-25 inmates and sent to four separate yards. (Plaintiff's Dep. p. 12).

3

18. The plaintiff testified that Inmate McDaniel tried to attack the plaintiff in the yard on an unspecified date. McDaniels spit on the plaintiff, and other inmates held McDaniels back. (Plaintiff's Dep. p. 12). On another unspecified date, inmates McDaniel, Smith, Cordova and Davis tried to jump the plaintiff in the yard, but other inmates intervened.[4] The plaintiff did not go back to the yard after the second incident, for fear of his safety. (Plaintiff's Dep. 13-14).

19. Soon after he was moved to gallery 4 in December, 2001, the plaintiff began filing grievances asserting that he feared for his safety because of his declared enemies on gallery 4. He asked to be moved off of gallery four or transferred out of Menard.

20. For example, on December 28, 2001, the plaintiff field a grievance stating his life was in danger because his enemies were on gallery 4, particularly Williams, who had "threaten[ed his] life over and over again . . . ." (d/e 43, Ex. I, p. 3). The counselor's response was that the plaintiff and Williams were not in close proximity.

21. In a January 16, 2002 grievance, the plaintiff identified inmates Williams and Davis as enemies, as well as an inmate "McDanials," who the plaintiff said threatened his life: "I have (2) enemies on (4) gallery, Williams in 445 and Davis in 443, since I've been on this gallery behind the 420's door, inmate McDanials [sic] in 422 has also threaten [sic] my life, stating that his Boy (2-Pac) Williams told him to handle his business since he was very close to my cell . . .My yard restriction is over next week, and I want my yard, and I don't want to be assulted [sic] on the yard! But it seems staff does!"

22. In response to the January 16, 2002, grievance, the counselor advised the plaintiff to list the names of inmates he wanted to declare as enemies, and told the plaintiff he "was not required to participate in yard activity."

23. In response to the January 16, 2002, grievance, Defendant Gross (the grievance officer) requested information from the superintendent, and then issued the following memo:

Inmate grieves he gave Supt. Hasemeyer a kite informing him of who started the trouble on the night of 10/23/01 and now inmates are wanting to jump on him. He requests his yard without fear of being assaulted.

Supt. Spiller stated on 2/7/02 that this inmate can go to yard if he chooses to and in fact, he want last week. He can be celled on the same gallery as his listed enemies.

Inmate is in disciplinary segregation status and is not being celled with any of his listed enemies. No further action will be taken.

(d/e 43, Ex. I p. 6). Defendant Walls concurred.

24. The plaintiff filed another grievance on January 25, 2002, again asking to be moved off gallery four, identifying inmates in cells 422 (McDaniel), 443 (Davis) and 445 (Williams) as enemies. (d/e 42, Ex. G., p. 4).

25. On April 24, 2002, the plaintiff filed another grievance: "My life is being threaten[ed] by inmate McDaniels in 441 NII seg and Hall 442 NII seg, inmate McDaniels 441 is on my KSF list, I was told by both inmates to not come to yard Friday, if I do, I will be stabed [sic]." (d/e 43, Ex. I p. 7).

---

[4]According to the plaintiff's documents, Cordova transferred from Hill Correctional Center to Menard gallery 4, N2 on January 18, 2002. The plaintiff identified Cordova as an enemy in a grievance dated July 22, 2002–it is not clear if Cordova was identified as an enemy before then.

4

26. In response to the April 24th grievance, Defendant Gross requested information from the Superintendent, and Walls concurred. ((d/e 43, Ex. I p. 8). Captain Gales purportedly responded:

> Bey do not any [sic] inmate in n2 seg on his enemy list. Inmate Bey is listed as a predator and can only be celled with another predator. Inmate Bey do not have to go the [sic] yard if he don't [sic] want to. The only inmate on inmate Bey enemies [sic] list is inmate Burnom N-53396 who is in the east cell house.

(D/e 43, Ex. G. p. 7). Defendant Gross apparently found this answer satisfactory and took no further action. (d/e 43, Ex. G, p. 8). Defendant Walls concurred. *Id.*

27. The plaintiff also submits a letter, purportedly from him to Defendant Walls dated April 2, 2002, in which the plaintiff states "I'm writing you in concern of my life! I've been threaten, stuff has been thrown in my cell, the workers threaten me as well! . . .When I go down the gallery to shower most of the guys try to hit me with stuff they have in socks threw [sic] the bars. I can't sleep at night cause [sic] the guys throw stuff in may cell. They moved one of my enemies [sic] right next door to me, McDaniel, he's been throwing stuff in my cell. There [sic] like 4 inmates who are on my enemie [sic] list, that's on this gallery, I've told you this, I've written letter after letter about this. Would you please move me, PLEASE?" (d/e 43, Ex. I, p. 16).

28. The plaintiff testified in his deposition that inmates would try to hit him in the head with socks filled with soap as he passed by, but that he never actually got hit because the officer escorting him sheltered him. (Plaintiff's Dep. p. 50-52).

29. On May 7, 2002, the plaintiff filed a grievance repeating that he had already declared the following inmates as enemies: Moore, Williams, McDaniel and Davis. The plaintiff asked why Cpt. Gales had represented the plaintiff had no declared enemies on gallery four.

30. A grievance response from Defendant Gross dated May 20, 2002, states that "This officer checked with OTS for inmate's "KSF" list and all the above inmates have been listed as his enemies [Moore, Williams, McDaniel and Davis (N2443)]. Inmate is in disciplinary segregation status and is not celled with any of the inmates. He may request Protective Custody status once he is released from segregation. I find this issue to be moot." (d/e 43, Ex. I p. 9). Defendant Walls concurred. *Id.*

31. On May 28, 2002, the plaintiff field another grievance about his enemies trying to attack him during yard: "[E]very time I go to yard, and the yard C/O is not around, one or all of my enemies try to jump me, and I have to run around the yard to try to get away from them. . .I'm going to yard Friday, and I'm not going to fight back or run from anyone any more. I should be able to go to yard without having to fight my enemies I claimed as enemies!" (d/e 43, Ex. I. p. 10).

32. A memo to Defendant Gross from Cpt. Gales dated June 7, 2002, stated: "On 06-05-02 inmate Bey was moved from 4 gal to 3 gal. He have [sic] no Enemies on 3 Gal. The move should solve his grievance." (d/e 43, Ex. G, p. 12). Defendant Gross subsequently denied the May 28, 2002 grievance as moot based on Cpt. Gales' memo. (d/e 43, Ex. I, p. 12).

33. Though the plaintiff was moved from gallery 4 to gallery 3 on or about June 6, 2002, his troubles continued. The plaintiff testified in his deposition that some of his enemies were moved with him to gallery three. His documentation supports an inference that Inmate Williams was moved to gallery three on June 21, 2002 until July 12, 2002, and that Inmate Moore (a declared enemy) was already on gallery three. (d/e 43, Ex. H, pp. 5-6).

34. On July 22, 2002, the plaintiff filed a grievance claiming as enemies inmates Davis (B79405)(a different Davis from the one in gallery 4), Smith (B26375) and Cordova K78342: "Now there is (3) more inmates threatening me every time I see them, and I want to be kept away from them, these inmates are trying to hit me with a sock filled with a bar of soap!"[5]

35. In response to the July 22, 2002, grievance, Defendant Gross stated that, "Cell placement is at the discretion of Administrative staff. Inmate is currently in segregation and may request P.C. placement once he is released from Seg. Per A.D. 05.06.115 . . . a transfer request shall normally not be processed unless the inmate has remained in general population . . . for at least six months. . ." (d/ 43, Ex. G, p. 15). Defendant Gross took no further action; Defendant Walls concurred.

36. The plaintiff was transferred out of Menard in late October or early November, 2002. (Plaintiff's Dep. p. 37). He is currently incarcerated in Hill Correctional Center.

**Analysis**

*Retaliation for Filing Grievances*

Defendants argue that there is no evidence that they acted out of retaliation for the plaintiff's exercise of his First Amendment rights.

Acts which are constitutional can become unconstitutional if done in retaliation for the exercise of a constitutionally protected right. *See DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 1999)(citations omitted). Retaliation for filing grievances or lawsuits states a claim under § 1983. *Johnson v. Stovall*, 233 F.3d 486, 489 (7th Cir. 2000)(allegation that nurse filed false disciplinary report in retaliation for inmate's grievance stated claim); *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000)(allegation that librarian denied library access to inmate in retaliation for his grievance stated claim).

The plaintiff does not dispute that Defendants Gross and Walls were not involved in retaliation by another officer not part of this case, Lt. Dilday. Thus, Lt. Dilday's alleged retaliation is not a part of this case.

The plaintiff's retaliation claim against Defendants Gross and Walls appears to be based on two assertions: 1) that Gross and/or Walls were involved in his transfer to a feces-covered cell in gallery four in retaliation for his November, 2001, grievance challenging his discipline for the food strike; and, 2) that defendant Gross and Walls refused his pleas to remove him from gallery four in retaliation for his November, 2001 grievance and/or the grievances he filed about his placement on gallery four. He also seems to assert that the denial of a phone call to his family was in retaliation for those grievances.

The court believes that the defendants have not met their burden of showing no genuine issue of material fact exists on the retaliation claim. They point only to the plaintiff's deposition, in which he admits he does not know if Defendants Walls and Gross had anything to do with his initial transfer to gallery four. (Plaintiff's Dep. 48-49). The plaintiff also stated that he "doubt[ed]" if Gross and Walls told anyone to move him to gallery four, "but I wanted to know why I was moved and moved under these conditions . . . The man probably didn't know me from anyone else." *Id.* at 49.

Despite his deposition, the plaintiff argues that an inference of retaliation can be drawn from the timing of his November grievance and his move to gallery four. He does not offer evidence that Defendant Walls and Gross were involved in the decision to move him, but the defendants offer no evidence to suggest that they were not involved in the decision. Defendants have offered no affidavits regarding who determined the plaintiff's cell

---

[5] It is not clear how Cordova had access to the plaintiff in July, as it appears he was on gallery 4 at this time.

placements, or why those placements were made; the defendants have offered no affidavits of their own, or any other prison official's, setting forth their personal knowledge of the events. As it stands, there is not enough evidence in the record to warrant any conclusions about the defendants' authority and involvement in the plaintiff's transfer to gallery four. The plaintiff's deposition testimony may be used to impeach him, but it does not alone warrant summary judgment in favor of defendants. And, their denial of his grievances after he was transferred to gallery four allows a reasonable inference that they could have done something to move him at that point. They do not assert otherwise.

*Eighth Amendment*

Defendants argue that there is no evidence of deliberate indifference to the plaintiff's safety because: 1) the plaintiff was in a single cell 24 hours a day; 2) cell 420 had a steel door preventing enemies from throwing things at him; 3) the plaintiff asked to be moved out of cell 420; 4) correctional staff shielded the plaintiff with their own bodies when inmates tried to attack the plaintiff while he moved down the gallery; 5) correctional staff intervened when the plaintiff's enemies tried to attack him in the yard.

"Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). Prison officials must "'take reasonable measures to guarantee the safety of the inmates'" . . ." *Boyce v. Moore*, 314 F.3d 884, 887 (7th Cir. 2002), citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)(other citations omitted). The plaintiff must show that a "substantial risk of serious harm" existed and that the defendants subjectively disregarded that risk. *Farmer*, 511 U.S. at 837 (1994).

However, in a failure-to-protect claim, an inmate cannot recover money damages for a past "failure to prevent *exposure* to risk of harm," as compared to a failure to prevent harm that actually occurred. *Babcock v. White*, 102 F.3d 267, 272 (7th Cir. 1996). In *Babcock*, the Seventh Circuit upheld dismissal of a failure-to-protect claim against federal prison officials, where the prisoner was placed in a federal prison with gang members who posed a serious risk. The prisoner chose to remain in administrative detention and did not participate in recreation for fear of being assaulted. He was also threatened by other prisoners, housed near a notoriously dangerous gang member, and scalding water was thrown in his cell. Nevertheless, the Seventh Circuit held that the inmate could not seek money damages for "officials' past failure to take measures to protect the prisoner from inmates known to pose a danger to the prisoner" because the prisoner was never actually assaulted and was no longer at risk of being assaulted (he was transferred before he brought he suit). 102 F.3d at 270.

Here, the plaintiff asserts that inmate McDaniel spit on him and tried to attack him in the yard twice, once alone and another time with the help of inmates Smith, Cordova and Davis. McDaniel also threw feces and other unpleasantries into the plaintiff's cell, and unspecified inmates tried to assault the plaintiff when he was escorted down the gallery. However, the plaintiff appears to admit in his deposition that he was never actually hit, because others intervened to protect him, and because he eventually chose not to go to yard after the attempted assaults. (Plaintiff's Dep. p. 13-14, 51).

The Court cannot conclude with certainty from the plaintiff's deposition alone that the plaintiff's failure-to-protect claim fails under *Babcock*. There is no detail in the record of these incidents. Further development of the testimony at trial may elicit details that might permit an inference that the plaintiff was actually assaulted—or that *Babcock* is not dispositive. *Babcock* carved out an exception for "exposure to risk of harm" that "result[s] from an official's malicious or sadistic intent." 102 F.3d at 270. No conclusions about the defendants' intent can be drawn from the present record. Additionally, it is not clear whether the plaintiff had any opportunity to exercise unless he went to yard, or whether that affects the analysis. *Cf. Babcock*, 102 F.3d at 269, n. 2 (prisoner apparently had an opportunity to attend administrative detention yard, which was separate from gang members).

The plaintiff also asserts that the walls of cell 420 were covered in feces and urine. He says he was given no cleaning materials and had to use his own clothes to clean the walls. He says that he was denied a phone call to his family for two weeks after his mother's death. A feces-covered cell with no cleaning supplies satisfies the

7

objective test for cruel and unusual punishment. Similarly, the situation with McDaniel repeatedly throwing feces and other things in the cell might also implicate an objectively serious deprivation (though probably not the two-week denial of the phone call). The harder question is whether Defendant Walls and Gross were deliberately indifferent to those conditions. It is true that the plaintiff testified in his deposition that he did not file his grievance until after he cleaned up the cell. Walls and Gross cannot be held liable for their subordinate's misbehavior, nor can they be liable based on the plaintiff's speculation. However, the plaintiff argues that Defendant Walls personally refused to give him cleaning supplies. Additionally, he seems to argue that Walls and Gross somehow knew of the cell's condition before his transfer there. Without affidavits from Walls and Gross, or affidavits from officials personally involved in these incidents, the court does not believe summary judgment is appropriate on the plaintiff's deposition alone.

*Personal Responsibility*

Defendants argue, without citation, that they cannot be held personally liable solely because of their responses to the plaintiff's grievances. The grievances, however, give rise to a reasonable inference that they were aware of the plaintiff's predicament and failed to take action. That is sufficient to infer personal responsibility on their part. A defendant is personally responsible if the "conduct occur[s] with his knowledge or consent." *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001).

*Qualified Immunity*

Defendants argue, again without citation to authority, that the plaintiff had no clearly established Constitutional right to be housed in a separate segregation unit from his enemies. The record is not developed enough at this point to conclude that is the plaintiff's primary contention. Additionally, the defendants do not address the plaintiff's other claims. Qualified immunity is therefore not appropriate on the current record.

*Plaintiff's Motion for Summary Judgment*

The plaintiff's motion for summary judgment shows there are genuine issues in dispute, which precludes summary judgment for *either* party. The plaintiff's motion will therefore be denied.


IT IS THEREFORE ORDERED:

1) The parties' motions for summary judgment are denied (d/e's 38, 41).

2) A final pretrial conference is scheduled for March 13, 2006, at 1:30 p.m.. The plaintiff shall appear by video conference. The defendants' attorney(s) shall appear in person before the court sitting in Urbana. The parties are further directed to submit the proposed final pretrial order by March 6, 2006. The defendants are reminded that they bear the responsibility for preparing the final pretrial order pursuant to Local Rule 16.3-4(H).

3) The proposed final pretrial order must include (1) the name, prison number, and place of incarceration for each inmate to be called as a witness; 2) the name and place of employment for each Illinois Department of Corrections employee to be called as a witness; and 3) the names and addresses of any witnesses who are not inmates or IDOC employees for whom the plaintiff seeks a trial subpoena. The plaintiff is responsible for timely requesting the subpoenas–i.e., with sufficient time for him to serve them before trial. The plaintiff must provide the witness fee and mileage fee to such witnesses and is responsible for service of those subpoenas under Fed. R. Civ. P. 45;

    4)  A jury trial is scheduled for March 20, 2006, at 9:00 a.m. at the U.S. Courthouse, 201 S. Vine St., Urbana, IL.  The plaintiff and the defendants shall appear in person before the court sitting in Urbana.  Inmates of the Illinois Department of Corrections who are not parties to this case shall appear by video conference and IDOC employees who are not parties may appear by video conference.  The Clerk is directed to issue appropriate process for the personal appearance of the plaintiff at the trial and the video appearance of the inmate witnesses listed in the final pretrial order who are not parties to this case and of those IDOC employees listed in the final pretrial order who will appear by video.

Entered this 25th  day of August , 2005.

                                            **s\Harold A. Baker**

                                            HAROLD A. BAKER
                                     UNITED STATES DISTRICT JUDGE